Barry I. Levy, Esq.
Michael A. Sirignano, Esq.
Frank P. Tiscione, Esq.
Alexandra Wolff, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Liberty Mutual Insurance Company,
Liberty Mutual Fire Insurance Company, Liberty Insurance
Corporation, The First Liberty Insurance Corporation, LM
Insurance Corporation, Liberty Mutual Mid-Atlantic Insurance
Company, Liberty County Mutual Insurance Company, LM
Property and Casualty Insurance Company, Safeco Company
of Indiana, and American States Insurance Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
LIBERTY MUTUAL INSURANCE COMPANY,
LIBERTY MUTUAL FIRE INSURANCE COMPANY,
LIBERTY INSURANCE CORPORATION, THE
FIRST LIBERTY INSURANCE CORPORATION, LM
INSURANCE CORPORATION, LIBERTY MUTUAL
MID-ATLANTIC INSURANCE COMPANY,
LIBERTY COUNTY MUTUAL INSURANCE
COMPANY, LM PROPERTY and CASUALTY
INSURANCE COMPANY, SAFECO COMPANY OF
INDIANA, and AMERICAN STATES INSURANCE
COMPANY,

                    Plaintiffs,

      -against-

FIRST SUPPLY, INC., JACOB BINYAMINOV, and
JOHN DOE DEFENDANTS 1-10,

                    Defendants.
------------------------------------------------------------------X

Docket No.:_____ (    )

**Plaintiff Demands a Trial by Jury**

1

## COMPLAINT

Plaintiffs, Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, The First Liberty Insurance Corporation, LM Insurance Corporation, Liberty Mutual Mid-Atlantic Insurance Company, Liberty County Mutual Insurance Company, LM Property and Casualty Insurance Company, Safeco Company of Indiana, and American States Insurance Company (collectively "Liberty Mutual" or "Plaintiffs"), as and for their Complaint against Defendants, First Supply, Inc. ("First Supply"), Jacob Binyaminov ("Binyaminov"), and John Doe Defendants "1" through "10" ("John Doe Defendants") (collectively, the "Defendants"), hereby allege as follows:

## NATURE OF THE ACTION

1. This action seeks to recover monies that were wrongfully obtained by Defendants from Liberty Mutual, and expunge pending fraudulent billing submitted to Liberty Mutual by Defendants, relating to medically unnecessary, illusory, and otherwise unreimbursable durable medical equipment ("DME") in the form of purported sustained acoustic devices (hereinafter "SAM Units" or the "Fraudulent Equipment") allegedly dispensed by First Supply.  First Supply purportedly dispensed the Fraudulent Equipment on a rental basis to New York automobile accident victims insured by Liberty Mutual ("Insureds"), without regard for whether the Insureds had any need for a SAM Unit.

2. First Supply is owned and controlled by Binyaminov.  Binyaminov devised a scheme to exploit New York's No-Fault insurance system by targeting the prescription and dispensing of purported SAM Units in order to bill Liberty Mutual and other New York automobile insurance companies thousands of dollars for SAM Units provided to Insureds, often billing a total of $3,300 in rental charges for each Insured.  In furtherance of the scheme, the Defendants colluded

with operators and managers (the "Clinic Controllers") of various No-Fault medical clinics (the "No-Fault Clinics) as well as various physicians and other healthcare providers (the "Prescribing Practitioners") that prescribed DME to the Insureds treating at the No-Fault Clinics, to steer prescriptions for the Fraudulent Equipment to First Supply, to the extent prescriptions were even actually issued.

3.      As part of the scheme, Defendants intentionally utilized unauthorized, forged, and illegally duplicated prescriptions to claim entitlement to inflated fees to which they were never entitled.  Indeed, several of the physicians who allegedly authorized large volumes of prescriptions for SAM Units dispensed by First Supply have affirmed that they never prescribed any such devices and did not even know what the device would be used.  Moreover, to the extent First Supply actually dispensed the Fraudulent Equipment, the Defendants knew that: (i) the devices were not medically necessary; (ii) the Insureds had no genuine need for the devices; and (iii) the prescribing and dispensing of the devices on a rental basis was done solely to wrongfully obtain money from insurance companies.

4.      By this action, Liberty Mutual seeks to recover more than $490,000.00 that has been wrongfully obtained by the Defendants, and further seeks a declaration that it is not legally obligated to pay reimbursement of more than $316,000.00 in pending no-fault insurance claims that have been submitted through First Supply, because:

(i)      Defendants billed Liberty Mutual for the Fraudulent Equipment that was not medically necessary and was prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care;

(ii)      Defendants, in many instances, billed Liberty Mutual for the Fraudulent Equipment as a result of forged, unauthorized, or illegally duplicated prescriptions;

(iii)   Defendants billed for the Fraudulent Equipment purportedly provided to Insureds through the use of unlawful kickback and financial arrangements; and

(iv)   to the extent that any Fraudulent Equipment was provided to Insureds, the bills submitted to Liberty Mutual by the Defendants fraudulently inflated the charges.

5.   The Defendants fall into the following categories:

(i)   First Supply is a New York corporation that purported to dispense the Fraudulent Equipment to persons who were allegedly injured in motor vehicle accidents, and billed New York automobile insurance companies, including Liberty Mutual;

(ii)   Binyaminov is the individual who, at all relevant times, has owned and controlled First Supply, and who used First Supply as part of a fraudulent scheme to submit bills to Liberty Mutual and other New York automobile insurance companies for purportedly dispensing the Fraudulent Equipment to automobile accident victims; and

(iii)   the John Doe Defendants are individuals who are presently not identifiable, but who knowingly participated in the fraudulent scheme by, among other things, assisting with the operation of First Supply and dispensing of SAM Units, engaging in illegal financial and kickback arrangements to obtain patient referrals for First Supply, and furthering the predetermined fraudulent protocols used to maximize profits without regard to genuine patient care.

6.   As discussed below, Defendants at all times have known that the claims for Fraudulent Equipment submitted to Liberty Mutual by First Supply were fraudulent because: (i) the Defendants billed Liberty Mutual for Fraudulent Equipment that was not medically necessary and was prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants billed for the Fraudulent Equipment purportedly provided to Insureds through the use of unlawful kickback and financial arrangements; (iii) the Defendants, in many instances, billed Liberty Mutual for Fraudulent Equipment as a result of forged, unauthorized, or illegally duplicated

prescriptions; and (iv) to the extent that any Fraudulent Equipment was provided to Insureds, the bills submitted by the Defendants to Liberty Mutual fraudulently inflated the charges.

7.      As such, the Defendants do not now have – and never had – any right to be compensated for their claims for the Fraudulent Equipment.

8.      The chart attached hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that have been identified to date that the Defendants submitted, or caused to be submitted, to Liberty Mutual by the Defendants in the name of First Supply.

9.      The Defendants' fraudulent scheme against Liberty Mutual and the New York automobile insurance industry began on or about July 10, 2021 and continues uninterrupted through the present day in that the Defendants continue to attempt collection on their bills for the Fraudulent Equipment.

## THE PARTIES

### I.      Plaintiffs

10.     Plaintiffs Liberty Mutual Insurance Company and Liberty Mutual Mid-Atlantic Insurance Company are Massachusetts corporations with their principal place of business in Boston, Massachusetts.  Liberty Mutual Insurance Company and Liberty Mutual Mid-Atlantic Insurance Company are authorized to conduct business and to issue policies of automobile insurance in the State of New York.

11.     Plaintiffs Liberty Insurance Corporation, The First Liberty Insurance Corporation and LM Insurance Corporation are Illinois corporations with their principal place of business in Boston, Massachusetts.  Liberty Insurance Corporation, The First Liberty Insurance Corporation and LM Insurance Corporation are authorized to conduct business and to issue policies of automobile insurance in the State of New York.

12.     Plaintiff Liberty Mutual Fire Insurance Company is a Wisconsin corporation with its principal place of business in Boston, Massachusetts.  Liberty Mutual Fire Insurance Company is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

13.     Plaintiff Liberty County Mutual Insurance Company is a Texas corporation with its principal place of business in Boston, Massachusetts.  Liberty County Mutual Insurance Company is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

14.     Plaintiffs LM Property and Casualty Insurance Company, Safeco Company of Indiana, and American States Insurance Company are Indiana corporations with their principal place of business in Boston, Massachusetts.  LM Property and Casualty Insurance Company, Safeco Company of Indiana, and American States Insurance Company are authorized to conduct business and to issue policies of automobile insurance in the State of New York.

**II.     Defendants**

15.     Defendant First Supply is a New York corporation with its principal place of business in Brooklyn, New York. First Supply was incorporated on June 17, 2021, is owned by Binyaminov, and has been used by Defendants as a vehicle to submit fraudulent billing to Liberty Mutual and other New York automobile insurers.

16.     Defendant Binyaminov resides in and is a citizen of New York. Binyaminov is not and has never been a licensed healthcare provider.

17.     Upon information and belief, the John Doe Defendants are citizens of New York and individuals who are presently not identifiable, but who knowingly participated in the fraudulent scheme by, among other things, assisting with the operation of First Supply and the

dispensing of the Fraudulent Equipment, engaging in illegal financial and kickback arrangements to obtain patient referrals for First Supply, and furthering the predetermined fraudulent protocols used to maximize profits without regard to genuine patient care.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interests and costs, and is between citizens of different states.

19.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over claims brought under 18 U.S.C. § 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.   Additionally, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

20.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

21.     Liberty Mutual underwrites automobile insurance in New York.

**I.      An Overview of the Pertinent Laws**

**A.      Pertinent Laws Governing No-Fault Insurance Reimbursement**

22.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.

23.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65,

*et seq.*) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

24.     In New York, No-Fault Benefits include up to $50,000.00 per Insured for medically necessary expenses that are incurred for healthcare goods and services, including goods for DME and OD. See N.Y. Ins. Law § 5102(a).

25.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "New York Fee Schedule").

26.     Pursuant to the No-Fault Laws, healthcare service providers are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

27.     For instance, the implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of healthcare services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

28.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare service providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.  In Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389, 393 (2019), the New York Court of Appeals reiterated that only licensed physicians may practice medicine in New York because of the

8

concern that unlicensed physicians are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

29.     New York law prohibits licensed healthcare service providers from paying or accepting kickbacks in exchange for referrals for DME. See, e.g., N.Y. Educ. Law §§ 6509-a; 6530(18); 6531; 8 N.Y.C.R.R. § 29.1(b)(3).

30.     Prohibited kickbacks include more than simple payment of a specific monetary amount, it includes "exercising undue influence on the patient, including the promotion of the sale of services, goods, appliances, or drugs in such manner as to exploit the patient for the financial gain of the licensee or of a third party". See N.Y. Educ. Law §§ 6509(10), 6530(17); 8 N.Y.C.R.R. § 29.1(b)(2).

31.     Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary goods and services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

32.     In the alternative, a healthcare service provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500" or "CMS-1500 form").

33.     Pursuant to Section 403 of the New York State Insurance Law, the NF-3 Forms submitted by healthcare service providers to Liberty Mutual, and to all other automobile insurers, must be verified subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

34.     Similarly, all HCFA-1500 (CMS-1500) forms submitted by a healthcare service provider to Liberty Mutual, and to all other automobile insurers, must be verified by the healthcare service provider subject to the following warning:

> Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

**B.      Pertinent Regulations Governing No-Fault Benefits for DME**

35.     Under the No-Fault Laws, No-Fault Benefits can be used to reimburse medically necessary DME that was provided pursuant to a lawful prescription from a licensed healthcare provider. <u>See</u> N.Y. Ins. Law § 5102(a). By extension, DME that was provided without a prescription, pursuant to an unlawful prescription, or pursuant to a prescription from a layperson or individual not lawfully licensed to provide prescriptions, is not reimbursable under No-Fault.

36.     DME generally consists of items that can withstand repeated use, and primarily consists of items used for medical purposes by individuals in their homes. For example, DME can include items such as bed boards, cervical pillows, orthopedic mattresses, electronic muscle stimulator units ("EMS units"), infrared heat lamps, lumbar cushions, orthopedic car seats, transcutaneous electrical nerve stimulators ("TENS units"), electrical moist heating pads (known as thermophores), cervical traction units, whirlpool baths, cryotherapy, continuous passive motion devices, and devices to prevent deep vein thrombosis.

37.     To ensure that Insureds' $50,000.00 in maximum No-Fault Benefits are not artificially depleted by inflated DME charges, the maximum charges that may be submitted by healthcare providers for DME are set forth in the New York Fee Schedule.

38.     In a June 16, 2004 Opinion Letter entitled "No-Fault Fees for Durable Medical Equipment", the New York State Insurance Department recognized the harm inflicted on Insureds by inflated DME charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

39.     As it relates to DME, the New York Fee Schedule sets forth the maximum charges as follows:

> (a)     The maximum permissible charge for the purchase of durable medical equipment… and orthotic [devices] . . . shall be the fee payable for such equipment or supplies under the New York State Medicaid program at the time such equipment and supplies are provided . . . if the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable, shall be the lesser of:
>
> (1) the acquisition cost (i.e., the line item cost from a manufacturer or wholesaler net of any rebates, discounts, or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or
>
> (2) the usual and customary price charged to the general public.

See 12 N.Y.C.R.R. § 442.2.

40.     As indicated by the New York Fee Schedule, payment for DME is directly related to the fee schedule set forth by the New York State Medicaid program ("Medicaid").

41.     According to the New York Fee Schedule, in instances where Medicaid has established a fee payable ("Fee Schedule item"), the maximum permissible charge for DME is the fee payable for the item set forth in Medicaid's fee schedule ("Medicaid Fee Schedule").

42.     For Fee Schedule items, Palmetto GBA, LLC ("Palmetto"), a contractor for the Center for Medicare & Medicaid Services ("CMS"), was tasked with analyzing and assigning

HCPCS Codes that should be used by DME companies to seek reimbursement for – among other things – Fee Schedule items. The HCPCS Codes and their definitions provide specific characteristics and requirements that an item of DME must meet in order to qualify for reimbursement under a specific HCPCS Code.

43.    The Medicaid Fee Schedule is based upon fees established by Medicaid for HCPCS Codes promulgated by Palmetto.  Medicaid has specifically defined the HCPCS Codes contained within the Medicaid Fee Schedule in its Durable Medical Equipment, Orthotics, Prosthetics and Supplies Procedure Codes and Coverage Guidelines ("Medicaid DME Procedure Codes") which mimic the definitions set forth by Palmetto.

44.    Where a specific DME does not have a fee payable in the Medicaid Fee Schedule ("Non-Fee Schedule item") then the fee payable by an insurer such as Liberty Mutual to the provider shall be the lesser of: (i) 150% of the acquisition cost to the provider; or (ii) the usual and customary price charged to the general public.

45.    For Non-Fee Schedule items, the New York State Insurance Department recognized that a provider's acquisition cost must be limited to costs incurred by a provider in a "bona fide arms-length transaction" because "[t]o hold otherwise would turn the No-Fault reparations system on its head if the provision for DME permitted reimbursement for 150% of any documented cost that was the result of an improper or collusive arrangement." See New York State Insurance Department, No-Fault Fees for Durable Medical Equipment, June 16, 2004 Opinion Letter.

46.    As it relates to charges for renting DME, the New York Fee Schedule sets forth the maximum charges as follows:

> the maximum permissible monthly rental charge for such equipment, supplies and services provided on a rental basis shall not exceed the lower of the monthly rental

charge to the general public or the price determined by the New York State Department of Health area office. The total accumulated monthly rental charges shall not exceed the fee amount allowed under the Medicaid fee schedule.

<u>See</u> 12 N.Y.C.R.R. § 442.2(b).

47.     As indicated by the New York Fee Schedule, the total monthly rental cost for Fee-Schedule items shall not exceed the <u>lower</u> of: (i) the monthly rental charge to the general public; or (ii) the monthly fee permitted under the Medicaid Fee Schedule.

48.     Additionally, DME suppliers are not entitled to separate charges for supplies and services provided in conjunction with the rental of DME.

49.     Regardless of whether DME is provided for patients to keep or rent, the maximum reimbursement rates set forth above includes all shipping, handling, and delivery. <u>See</u> 12 N.Y.C.R.R. § 442.2(c). As such, DME suppliers are not entitled to submit separate charges for shipping, handling, delivery, or set up of any DME.

## II.     **Defendants' Fraudulent Scheme**

### A.     **Overview of the Scheme**

50.     Beginning in or about July 2021, and continuing uninterrupted through the present day, Defendants masterminded and implemented a fraudulent scheme in which they used First Supply to exploit patients for financial gain by billing the New York automobile insurance industry for millions of dollars in inflated charges – which they were not eligible to receive – for the Fraudulent Equipment purportedly rented to Insureds.

51.     First Supply did not market or advertise to the general public, lacked any genuine retail or office locations, and operated without any legitimate efforts to attract patients who might need DME or healthcare practitioners who might legitimately prescribe DME.

52.     Similarly, Binyaminov did virtually nothing that would be expected of the owner of a legitimate DME supply company to develop its reputation in the medical community or to attract patients who might need DME or healthcare practitioners who might legitimately prescribe DME.

53.     Instead, the Defendants entered into illegal, collusive agreements with the Clinic Controllers and various Prescribing Practitioners working at various No-Fault Clinics, who were steered to prescribe and direct large volumes of the same prescriptions (or purported prescriptions) to First Supply for the specifically targeted Fraudulent Equipment. The Fraudulent Equipment was purportedly prescribed and dispensed as rentals to patients at the No-Fault Clinics.

54.     Unlike legitimate medical supply companies that dispense a variety of DME devices and healthcare related products, First Supply intentionally focused on and targeted the distribution of SAM Units, which it billed to Liberty Mutual using a "miscellaneous" HCPCS code- E1399.  SAM Units, in fact, were the only item of DME (along with associated coupling patches) that First Supply dispensed and rented to Insureds.

55.     Defendants chose the Fraudulent Equipment because they could acquire small, portable stimulation devices at low cost and submit false claims for reimbursement to Liberty Mutual for the purported lengthy rental of SAM Units to patients, typically for a period of six (6) weeks at a time with rental charges amounting to $2,940.00, but sometimes exceeding more than $4,000.00 per Insured.

56.     The Fraudulent Equipment billed by First Supply purports to be a "multi-hour" low intensity ultrasound device, but the device has not been proven effective for treating the injuries sustained by the Insureds involved in automobile accidents.

57.     First Supply's home rentals of the SAM Units were not medically necessary and were often dispensed using forged, unauthorized, and illegally duplicated prescriptions. To the extent First Supply actually provided the SAM Units to Insureds, the SAM Units were prescribed and dispensed not consistent with the manufacturer's recommendations and pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds.

58.     The prescriptions obtained by First Supply that were generated at the No-Fault Clinics were often forged or unauthorized and were pre-printed prescription forms designed to facilitate the referral of the expensive SAM Units in a predetermined fashion, using the exact same format, exact same print font, and exact same language. In fact, the majority of prescription forms submitted by First Supply were pulled from the SAM Unit manufacturer's website and include the SAM Unit logo on the top of the page.

59.     The Defendants used the pre-printed prescription forms to facilitate prescriptions for SAM Units and steer those prescriptions to First Supply to support their fraudulent claims for reimbursement.

60.     To conceal the volume of billing submitted by First Supply for each Insured, the Defendants typically unbundled the charges, submitting the bills for the rental of the SAM Units into multiple bills, using the "miscellaneous" billing code E1399, to bill as follows:

- Bill No. 1:

| Date of Service | Place of Service Including Zip Code | Description of Treatment or Health Service Rendered, Make, Model | Fee Schedule Treatment Code | Charges |
|---|---|---|---|---|
| 9/29/22-9/29/22 | Home | Disposable Coupling Patches | A9999 Qty:1 | 360.00 |
| 9/29/22-10/19/22 | Home | Sustained Acoustic Medicine | E1399 Qty:21 | 1470.00 |
| | | | Total Charges to Date: | 1830.00 |

- Bill No. 2:

| Date of Service | Place of Service Including Zip Code | Description of Treatment or Health Service Rendered, Make, Model | Fee Schedule Treatment Code | Charges |
|---|---|---|---|---|
| 10/20/22-11/4/22 | Home | Sustained Acoustic Medicine | E1399 Qty:16 | 1120.00 |
| | | | Total Charges to Date: | 1120.00 |

61.     Defendants spearheaded their fraudulent scheme involving the Prescribing Practitioners and the Clinic Controllers knowing that: (i) the Fraudulent Equipment was often prescribed and dispensed using forged, unauthorized, and illegally copied prescriptions; (ii) the Fraudulent Equipment, to the extent actually prescribed and dispensed, was done so pursuant to predetermined protocols designed to exploit the patients for financial gain, without regard to genuine patient care; (iii) the Fraudulent Equipment was the product of illegal, collusive arrangements intended to inflate the billing from First Supply to automobile insurers and to financially enrich the Defendants; and (iv) the Defendants intentionally targeted a specific item of DME (i.e., SAM Units) that they acquired at low cost and dispensed in large volumes to Insureds

16

at inflated charges.

**B.**     **Defendants' Submission of Forged Prescriptions and Forged Medical Reports**

62.     In keeping with the fact that SAM Units were not medically necessary, but rather prescribed and dispensed pursuant to predetermined fraudulent protocols and collusive kickback arrangements, many of the charges submitted by the Defendants to Liberty Mutual were based on forged or unauthorized prescriptions.

63.     For example, Patricia Kelly, M.D. ("Dr. Kelly"), a physician associated with Metro Pain Specialists P.C. ("Metro Pain") and its successor company, Triborough NY Medical Practice ("Triborough"), stated in a signed and notarized affidavit that she only wrote prescriptions for DME on very rare occasions and never issued prescriptions for, among other things, SAM Units. Dr. Kelly further stated, after reviewing multiple bills provided to her by Liberty Mutual, that her signature was forged, copied, or both in multiple instances, including where her name was purportedly used to prescribe a rental SAM Unit.

64.     Notwithstanding the fact that Dr. Kelly never prescribed a SAM Unit, First Supply submitted billing to Liberty Mutual for purported rentals of SAM Units, along with pre-printed prescription forms that purported to be signed by Dr. Kelly.  The prescription forms -- which prescribe the rental of a SAM Unit for multiple weeks and state that, among other things, the "sam unit is medically indicated and in my opinion is reasonable and necessary to treat this patient's condition" – are forged and unauthorized.  Tellingly, Dr. Kelly's corresponding examination reports made on the same date as the forged prescription identifies particular medication and DME that were prescribed, but there is never a mention of a SAM Unit being prescribed.

65.     As a further example, Michael Alleyne, M.D. ("Dr. Alleyne"), another physician associated with Metro Pain and Triborough, stated in an affidavit that he has never prescribed a

SAM Unit and does not even know what this device is.  Dr. Alleyne, in fact, reviewed numerous prescriptions and affirmed under oath that many prescriptions and referrals appear to have been generated without his permission or consent, some were forged, and others altered after his preparation.

66.     Notwithstanding the fact that Dr. Alleyne never prescribed a SAM Unit, First Supply submitted billing to Liberty Mutual for the purported rental of a SAM Unit, along with pre-printed prescription forms that purport to be signed by Dr. Alleyne.  The prescription forms -- which prescribe the rental of a SAM Unit for multiple weeks and make the same false statements, including, among other things, the "sam unit is medically indicated and in my opinion is reasonable and necessary to treat this patient's condition" – are forged and unauthorized.

67.     Further, additional charges submitted by the Defendants to Liberty Mutual were submitted based on forged or unauthorized prescriptions for SAM Units purportedly issued by other doctors or licensed practitioners, such as Dr. Phyllis Gelb ("Dr. Gelb").  Dr. Gelb advised Liberty Mutual that she did not write prescriptions for SAM Units and was not aware of what these devices were used for.  Yet, First Supply submitted billing to Liberty Mutual for the purported rental of a SAM Unit, along with forged prescription forms that purport to be signed by Dr.  Gelb.

68.     Further, additional charges submitted by First Supply to Liberty Mutual were based on prescriptions for SAM Units issued by physicians or other licensed practitioners, such as nurse practitioners, who were either coerced/manipulated into issuing the prescriptions by unlicensed persons who illegally controlled the provision of medical services at various No-Fault Clinics or who knowingly signed the prescriptions as part of a fraudulent predetermined protocol, likely as a condition of maintaining their employment at one of the No-Fault Clinics.

69.     For example, a nurse practitioner by the name of Inna Levtsenko advised Liberty

Mutual that the medical clinic where she worked was run and controlled by unlicensed laypersons and that she was instructed to issue prescriptions for medically unnecessary DME.   Not surprisingly, First Supply submitted billing to Liberty Mutual for the purported rental of SAM Units, along with pre-printed prescription forms that purport to be signed by Nurse Practitioner Levtsenko.

70.     In addition, Ruben Oganesov, MD is a physiatrist who primarily practices in Massachusetts but whose name has been used in connection with billing submitted by multiple professional corporations operating in New York, including prescribing for the Fraudulent Equipment, which were named as defendants in multiple affirmative fraud cases involving fraudulent services billed to New York No-Fault insurers.  See Government Employees Ins. Co. v. Oganesov et al., 1:22-cv-05693-RPK-PK (E.D.N.Y. 2022); Government Employees Ins. Co. v. Emmons Avenue Medical Office, P.C. et al., 1:22-cv-03922-RPK-PK (E.D.N.Y 2022).

71.     Similarly, First Supply submitted prescriptions in the names of Colin Clarke, M.D. and Igor Zinberman, F.N.P., both of whom have also been named as defendants in affirmative fraud cases involving fraudulent services billed to New York No-Fault insurers. See Allstate Ins. Co. v. Rose, Sr. et al., 1:22-cv-00279-WFK-MMH (E.D.N.Y. 2022); Gov't Emp. Ins. Co. et al. v. Exon Medical Equip., Inc. et al., 1:20-cv-02457-RRM-PK (E.D.N.Y. 2020); Allstate Ins. Co. et al. v. Halima et al., 1:06-cv-01316-DLI-SMG (E.D.N.Y. 2006); Liberty Mutual Ins. Co., et al. v. AVK Rx Inc. et al., 2:22-cv-07329-GRB-SIL (E.D.N.Y. 2022).

72.     To the extent any of the prescriptions used by First Supply were not actually forged or unauthorized, many of the Prescribing Practitioners whose names appear on prescriptions allegedly supporting First Supply's billing had no idea what the SAM Unit was, what it was used for, or had a legitimate medical basis to prescribe the devices at the time they issued the

prescriptions.  At best, the prescribing and dispensing of the SAM Units was done pursuant to predetermined protocols established through collusion among First Supply and various Clinic Controllers, who convinced the Prescribing Practitioners to issue prescriptions for SAM Units to the extent they actually knew of the prescriptions.

**C.     The Illegal Kickback and Referral Relationships with the Clinics**

73.     Though ostensibly organized to provide a range of healthcare services to Insureds at a single location, the No-Fault Clinics from where Defendants generated the prescriptions and referrals for the Fraudulent Equipment, in actuality, were organized to supply "one-stop" shops for No-Fault insurance fraud.

74.     Further, many of the No-Fault Clinics operate under the unlawful ownership and control of unlicensed laypersons and are actually nothing more than multidisciplinary medical mills organized to be convenient one-stop shops for No-Fault insurance fraud.

75.     For example, Dr. Kelly affirmed that all of the No-Fault Clinic locations where she worked "were controlled by layperson managers and each of the locations ha[d] treatment protocols in place" and that she "was instructed to prescribe certain medications to all patients even if [she] felt they were not warranted."

76.     Similarly, Dr. Alleyne advised Liberty Mutual that the No-Fault Clinics from where DME prescriptions originated were controlled by layperson managers and had "standard operating procedures" in place. Pursuant to those procedures, Dr. Alleyne received "increasing pressure to order and prescribe many unnecessary medications."

77.     The No-Fault Clinics that steered prescriptions for the Fraudulent Equipment to First Supply include, among others, the following:

(i)     160-59 Rockaway Boulevard., Jamaica;

      (ii)     717 Southern Boulevard, Bronx;

      (iii)    146 Empire Boulevard, Brooklyn;

      (iv)    60 Belmont Avenue, Brooklyn; and

      (v)     3041 Avenue U, Brooklyn.

78.    Liberty Mutual has received billing from many of the No-Fault Clinics from an ever-changing number of fraudulent healthcare providers, starting and stopping operations without any purchase or sale of a "practice"; without any legitimate transfer of patient care from one professional to another; and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's No-Fault insurance system.

79.    In addition, the No-Fault Clinic located at 717 Southern Boulevard, Bronx, which was a source of prescriptions for Fraudulent Equipment provided to the Defendants, was named in a criminal prosecution involving a complex no-fault insurance scheme. See USA v. Rose, 1:19-cr-00789-PGG (S.D.N.Y. 2019). The criminal prosecutions identified the 717 Southern Boulevard, Bronx location as a location run by laypersons using bribery and money laundering to generate falsified billing to submit to insurance carriers. Id.

80.    Further, the Defendants entered into collusive arrangements with the Clinic Controllers and the Prescribing Practitioners at the No-Fault Clinics in order to obtain access to Insureds, so that the Defendants could implement and execute their fraudulent scheme and maximize the No-Fault Benefits the Defendants could obtain from Liberty Mutual and other New York automobile insurers.  As part of the collusive arrangements, the Defendants steered the Clinic Controllers and Prescribing Practitioners to direct prescriptions (or purported prescriptions) for the Fraudulent Equipment to First Supply in exchange for kickbacks or other financial consideration.

81.     In keeping with the fact that the prescriptions for Fraudulent Equipment were the result of unlawful financial arrangements between the Defendants and the Clinic Controllers, the prescriptions for Fraudulent Equipment were not medically necessary and were provided, to the extent provided at all, pursuant to predetermined treatment protocols, as further explained below.

82.     Further, the prescriptions for Fraudulent Equipment were forged, unauthorized, or illegally duplicated prescriptions in many instances. In fact, Insureds were never given access to the prescriptions or given the option to use any other DME retailer for the SAM Units other than First Supply.

83.     As a result of the unlawful financial arrangements, First Supply obtained large volumes of prescriptions (or purported prescriptions) and large volumes of Insureds' identifying information that enabled them to bill nearly one million dollars to Liberty Mutual, alone, for a single device, over approximately two years, without operating any accessible retail location, without any legitimate marketing or advertising, and without offering or selling a variety of DME products beyond the Fraudulent Equipment.

84.     But for the payment of kickbacks from the Defendants, the Clinic Controllers, working with the Prescribing Practitioners, would not have had any reason to: (i) direct a substantial volume of medically unnecessary prescriptions to First Supply; (ii) make the Insureds' information available to First Supply; and/or (iii) provide First Supply with forged, unauthorized, or illegally duplicated prescriptions in many instances.

85.     Upon information and belief, the payment of kickbacks by the Defendants was made at or near the time the prescriptions were issued, but the Defendants and the Clinic Controllers affirmatively concealed the particular amounts paid since the payment of kickbacks in exchange for patient referrals violates New York law.

86.     As a result of the unlawful financial arrangements, the Defendants billed nearly one million dollars to Liberty Mutual, and likely millions of dollars to other New York automobile insurers, for the Fraudulent Equipment.

**D.     The Fraudulent Equipment was Prescribed Pursuant to Fraudulent Protocols in Order to Exploit Patients for Financial Gain**

87.     In addition to the unlawful financial arrangements between the Defendants and the Clinic Controllers, the prescriptions (or purported prescriptions) provided to the Defendants were the result of predetermined fraudulent protocols between and among the Defendants, the Clinic Controllers, and the Prescribing Practitioners implemented solely to maximize the billing that the Defendants could submit to automobile insurers, including Liberty Mutual, rather than to treat or otherwise benefit the Insureds.

88.     The Defendants' billing for the Fraudulent Equipment always included a charge of $360.00 under HCPCS Code A9999 for disposable coupling patches, and another charge for the rental of a "Sustained Acoustic Medicine" device or SAM Unit, that varied slightly, but typically totaled $2,796.00 per Insured for weeks of home use.

89.     The Fraudulent Equipment, upon information and belief, is a "SAM Unit" that is a battery powered, wearable low intensity ultrasound device for home use.

90.     There is no specific HCPCS Code for a SAM Unit, and, in fact, First Supply has billed charges for the purported rental of these devices under a miscellaneous code, E1399.

91.     Upon information and belief, commercial insurers do not provide reimbursement for SAM Units.  Aetna, for example, states that it considers "hands-free" ultrasound and low frequency sound devices experimental and investigational because their clinical values have not been established.

92.    Upon information and belief, in the claims identified in Exhibit "1", substantially all of the Insureds whom the Defendants purported to provide Fraudulent Equipment for were involved in relatively minor and low-impact "fender-bender" accidents, to the extent they were involved in any actual accidents at all.

93.    In a legitimate clinical setting, treatment for neck, back, or shoulder pain from low-impact "fender-bender" accidents should begin with conservative therapies such as short-term bed rest, rehabilitative exercises, physical therapy, and basic, non-steroidal anti-inflammatory analgesics, such as ibuprofen or naproxen sodium.

94.    If such conservative treatment does not resolve the patient's symptoms, the standard of care can include other conservative treatment modalities such as chiropractic treatment and the use of pain management medication.  These clinical approaches are well-established.

95.    In fact, the Insureds were virtually always directed to a course of supervised in-office conservative care, including physical therapy, chiropractic treatments, and pain medications, that was sufficient to treat the Insured's soft tissue injuries without the prescription and rental of a device not sufficiently proved to be effective.

96.    In a legitimate setting, when a patient injured in a motor vehicle accident seeks treatment by a healthcare provider, the patient's subjective complaints would be evaluated, and the treating provider would direct a specific course of treatment based upon the patients' individual symptoms or presentation and assess whether that course of treatment was working before prescribing a DME device, like a SAM Unit, that has not sufficiently been proven effective.

97.    In support of the fact that the prescriptions used by First Supply were the result of predetermined fraudulent protocols, these devices were prescribed to Insureds within days of their accidents – and before the Prescribing Practitioner had time to assess whether the supervised in-

office conservative care that the Insured was undergoing had resolved the Insured's injuries.  For example:

(i)     On January 20, 2022, an Insured named DW was purportedly involved in an automobile accident.  Thereafter, DW presented to a Clinic located at 3041 Avenue U, Brooklyn, New York.  After an examination with Natalia Feldman, N.P. ("Feldman") on January 24, 2022, Feldman purportedly issued a prescription, that was provided to First Supply, for the Fraudulent Equipment - *only 4 days* after DW's accident;

(ii)    On January 20, 2022, an Insured named OW was purportedly involved in an automobile accident.  Thereafter, OW presented to a Clinic located at 3041 Avenue U, Brooklyn, New York.  After an examination with Feldman on January 24, 2022, Feldman purportedly issued a prescription, that was provided to First Supply, for the Fraudulent Equipment - *only 4 days* after OW's accident;

(iii)   On February 21, 2022, an Insured named BF was purportedly involved in an automobile accident.  Thereafter, BF presented to a Clinic located at 146 Empire Blvd., Brooklyn, New York.  Following an examination with Deonarine Rampershad ("Rampershad") on February 22, 2022, Rampershad purportedly issued a prescription, that was provided to First Supply, for the Fraudulent Equipment - on the same date as the initial examination and *only 1 day* after BF's accident;

(iv)    On March 23, 2022, an Insured named LCR was purportedly involved in an automobile accident.  Thereafter, LCR presented to a Clinic located at 82-17 Woodhaven Blvd, Ridgewood, New York.  After an examination with Saint Jean on March 30, 2022, Saint Jean purportedly issued a prescription, that was provided to First Supply, for the Fraudulent Equipment - *only 7 days* after LCR's accident;

(v)     On March 29, 2022, an Insured named CA was purportedly involved in an automobile accident.  Thereafter, CA presented to a Clinic located at 82-17 Woodhaven Blvd., Ridgewood, New York.  After an examination with Julie Saint Jean, FNP ("Saint Jean") on March 30, 2022, Saint Jean purportedly issued a prescription, that was provided to First Supply, for the Fraudulent Equipment - *only 1 day* after CA's accident;

(vi)    On March 30, 2022, an Insured named EO was purportedly involved in an automobile accident.  Thereafter, EO presented to a Clinic located at 160-59 Rockaway Blvd., Jamaica, New York. After an examination with Patricia Kelly, D.O. ("Kelly") on April 4, 2022, Kelly purportedly issued a prescription, that was provided to First Supply, for the Fraudulent Equipment - *only 5 days* after EO's accident;

(vii)   On June 29, 2022, an Insured named BV was purportedly involved in an automobile accident. Thereafter, BV presented to a Clinic located at 717 Southern Blvd., Bronx, New York.  After an examination with Pak on June 30, 2022, Pak purportedly issued a prescription, that was provided to First Supply, for the Fraudulent Equipment - *only 1 day* after BV's accident;

(viii)  On June 30, 2022, an Insured named OB was purportedly involved in an automobile accident. Thereafter, OB presented to a Clinic located at 717 Southern Blvd., Bronx, New York.  After an examination with Hong Pak ("Pak") on June 30, 2022, on the same date as the initial examination and on ***the same day** as OB's accident*, Pak purportedly issued a prescription that was provided to First Supply;

(ix)    On August 6, 2022, an Insured named KW was purportedly involved in an automobile accident. Thereafter, KW presented to a Clinic located at 146 Empire Blvd., Brooklyn, New York.  After an examination with Tyrell Satchell-Lee, AGNR BC. ("Lee") on August 9, 2022, Lee purportedly issued a prescription, that was provided to First Supply, for the Fraudulent Equipment - *only 3 days* after KW's accident; and

(x)     On March 4, 2023, an Insured named ES was purportedly involved in an automobile accident. Thereafter, ES presented to a Clinic located at 3209 Fulton Street, Brooklyn, New York.  After an examination with Sheila Soman, M.D. ("Soman") on March 7, 2023, Soman purportedly issued a prescription, that was provided to First Supply, for the Fraudulent Equipment - *only 3 days* after ES's accident.

98.     These are only representative examples.

99.     Despite virtually all the Insureds being involved in relatively minor and low-impact accidents and only suffering from sprains and strains – to the extent the Insureds were actually injured at all –the Insureds identified in Exhibit "1" were all prescribed SAM Units dispensed by First Supply within days of the accident.

100.    In a legitimate setting, during the course of a patient's treatment, the provider may – but not always – provide DME that would aid in the treatment of the patient's symptoms.  The specific DME that would be prescribed to aid the treatment of the patient would always directly relate to the patients' individual symptoms or presentation.

101.    There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident. An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

102.    It is extremely improbable that multiple Insureds of different ages, sexes, and physical conditions, and who were located in different areas within a vehicle, who were involved in the same automobile accident would routinely need prescriptions for DME of substantially the same type and, where rental equipment is involved, for the same period of time, if those Insureds were being provided with legitimate, individualized and genuine patient care.

103.    In further keeping with the fact that the prescriptions for the Fraudulent Equipment identified in Exhibit "1" were part of a predetermined protocol designed to maximize profits and not based upon medical necessity, multiple Insureds involved in the same accident were each prescribed the same Fraudulent Equipment, which was not warranted by their purported soft tissue injuries, to the extent they were even injured at all.  For example:

    (i)     On June 1, 2021, three Insureds – LSS, GM, and VD,– were involved in the same automobile accident. Thereafter, LSS, GM, and VD were all purportedly dispensed SAM Units on a rental basis for several weeks, and First Supply billed Liberty Mutual a minimum of $2,460.00 for each of these Insureds pursuant to the predetermined fraudulent protocol established by the Defendants;

    (ii)    On July 17, 2021, two Insureds – YH and AT– were involved in the same automobile accident. Thereafter, YH and AT both purportedly were dispensed SAM Units on a rental basis for several weeks, and First Supply billed Liberty Mutual a minimum of $2,800.00 for each of these Insureds pursuant to the predetermined fraudulent protocol established by the Defendants;

    (iii)   On January 20, 2022, three Insureds – DW, OW, and TD – were involved in the same automobile accident. Thereafter, DW, OW, and TD were all purportedly dispensed SAM Units on a rental basis for four weeks, and First Supply billed Liberty Mutual a total of $2,330.00 for each of these Insureds

pursuant to the predetermined fraudulent protocol established by the Defendants;

(iv)     On August 6, 2022, two Insureds – KW and LW – were involved in the same automobile accident. Thereafter, KW and LW both purportedly were dispensed SAM Units on a rental basis for four weeks, and First Supply billed Liberty Mutual a total of $2,320.00 for each of these Insureds pursuant to the predetermined fraudulent protocol established by the Defendants;

(v)      On June 29, 2022, two Insureds – JV and BV – were involved in the same automobile accident. Thereafter, JV and BV both purportedly were dispensed SAM Units on a rental basis for four weeks, and First Supply billed Liberty Mutual a total of $2,320.00 for each of these Insureds pursuant to the predetermined fraudulent protocol established by the Defendants;

(vi)     On June 30, 2022, two Insureds – OB and VE – were involved in the same automobile accident. Thereafter, OB and VE both purportedly were dispensed SAM Units on a rental basis for four weeks, and First Supply billed Liberty Mutual a total of $2,320.00 for each of these Insureds pursuant to the predetermined fraudulent protocol established by the Defendants;

(vii)    On April 16, 2022, three Insureds –ZPG, JDE, and RRO in the same automobile accident. Thereafter, ZPG, JDE, and RRO were all purportedly dispensed SAM Units on a rental basis for six weeks, and First Supply billed Liberty Mutual a total of $3,300.00 for each of these Insureds pursuant to the predetermined fraudulent protocol established by the Defendants

(viii)   On August 13, 2021, two Insureds – RT and AB – were involved in the same automobile accident. Thereafter, RT and AB both purportedly were dispensed SAM Units on a rental basis for several weeks, and First Supply billed Liberty Mutual a minimum of $2,320.00 for each of these Insureds pursuant to the predetermined fraudulent protocol established by the Defendants;

(ix)     On August 16, 2021, two insureds – MB and GJ – were involved in the same automobile accident. Thereafter, MB and GJ both purportedly were dispensed SAM Units on a rental basis for several weeks, and First Supply billed Liberty Mutual a minimum of $2,530.00 for each of these Insureds pursuant to the predetermined fraudulent protocol established by the Defendants; and

(x)      On October 2, 2021, two Insureds – PW and JC – were involved in the same automobile accident. Thereafter, PW and JC both purportedly were

dispensed SAM Units on a rental basis for several weeks, and First Supply billed Liberty Mutual a minimum of $2,460.00 for each of these Insureds pursuant to the predetermined fraudulent protocol established by the Defendants.

104.    These are only representative examples.

105.    Additionally -- and again in a legitimate setting -- when a patient is prescribed DME by a healthcare provider, the healthcare provider would indicate in a contemporaneous evaluation report what specific DME was prescribed and why.  Such information is typically included in a contemporaneous report so the healthcare provider can recall what he or she previously prescribed and provide proper follow-up questions during a subsequent evaluation.

106.    In keeping with the fact that the prescriptions for the Fraudulent Equipment provided to Insureds was not medically necessary and provided, to the extent provided at all, pursuant to a predetermined fraudulent protocol, the contemporaneous examination reports written by healthcare providers virtually never made any reference to SAM Units being prescribed, nor was there any information in the contemporaneous examination reports to explain why the healthcare provider was prescribing the Fraudulent Equipment.

107.    Furthermore, and in keeping with the fact that the prescriptions for the SAM Units were not medically necessary and were provided pursuant to a predetermined fraudulent protocol, to the extent that Insureds returned for a follow-up examination, the follow-up examination reports never referenced or discussed the Insureds' previously prescribed SAM Units.

108.    In a legitimate setting, when a patient returns for a follow-up examination after being prescribed DME, the healthcare provider would inquire – and appropriately report – whether the previously prescribed DME aided the patient's subjective complaints. Such information is typically included so the healthcare provider can recommend a further course of treatment regarding the previously prescribed DME or adjust the patient's treatment as necessary.

109.     However, the follow-up examination reports from healthcare providers virtually always failed to include any information regarding Fraudulent Equipment prescribed to the Insureds on a prior date.

110.     In every claim identified in Exhibit "1", the Fraudulent Equipment was prescribed pursuant to predetermined protocols designed to maximize profits, and not based upon medical necessity.

### E.     The Inflated Charges for the Purported Rental of SAM Units

111.     Under the Medicaid Fee Schedule, the total monthly rental charges for equipment, supplies, and services, of Fee Schedule items is 10% of the maximum reimbursement amount.

112.     For dates of service prior to April 4, 2022, when DME was rented and charged to automobile insurers using HCPCS codes that are recognized by the Medicaid Fee Schedule but do not contain a maximum reimbursement amount, then the maximum charge for a monthly rental is 10% of the acquisition cost for the DME or OD, which includes all supplies that are provided with DME rental. See New York State Medicaid Program Durable Medical Equipment Manual Policy Guidelines, p. 16; see also Gov't Emples. Ins. Co. v. MII Supply LLC, Index No. 616953/18, Docket No. 43 (N.Y. Sup. Ct. Nassau Cty. December 4, 2019) (applying the 10% of acquisition cost rule for DME rentals, including all supplies, within the New York State Medicaid Program Durable Medical Equipment Manual Policy Guidelines to No-Fault reimbursement for HCPCS Codes that are recognized by the Medicaid Fee Schedule but do not contain a reimbursement amount).

113.     While rental items were subject to a maximum monthly rental cost, there was no "lifetime" cap for a DME item rented to an Insured.

114.    In an effort to reduce the blatant fraud committed against insurers for abusive charges relating to DME, the New York State Workers' Compensation Board replaced the New York State Medicaid Program's Durable Medical Equipment Fee Schedule with a new New York State Workers' Compensation Durable Medical Equipment Fee Schedule ("WC DME Fee Schedule") that became effective on April 4, 2022.

115.    Among other things, the WC DME Fee Schedule limited the reimbursement rates of certain previously abused DME charges, such as charges for the rental of certain continuous passive motion devices. The changes made for the reimbursement for DME by the New York State Workers' Compensation Board are reflected in 12 N.Y.C.R.R. 442.2 (2022).

116.    Similarly, effective June 1, 2023, the New York State Department of Financial Services issued an amendment to 11 N.Y.C.R.R. 68, adding Part E of Appendix 17-C, to address No-Fault reimbursement for DME that is not specifically identified by the WC DME Fee Schedule.

117.    However, between the time period of April 4, 2022, and May 31, 2023, to address the vagueness of determining the reimbursement of No-Fault for certain changes not identified in the WC DME Fee Schedule, the New York State Department of Financial Services issued an emergency amendment explaining the standard for reimbursement when there is no price contained in the WC DME Fee Schedule.

118.    Specifically, this emergency amendment capped the total rental of items to Insureds under HCPCS Code E1399 at the lesser of: (1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or (2) the usual and customary price charged to the general public.

119.   For dates of service on or after June 1, 2023, Part E of Appendix 17-C of 11 N.Y.C.R.R. 68 establishes calculations for the maximum permissible daily rental rates of Non-Fee Schedule items and the maximum total accumulated charges, as follows:

> (d)(1)   On or after June 1, 2023, the maximum permissible monthly rental charge for such durable medical equipment shall be one-tenth the acquisition cost to the provider.  Rental charges for less than one month shall be calculated on a pro-rated basis using a 30-day month.

> (2)   The total accumulated rental charge for such durable medical equipment shall be the least of the:
> (i)      Acquisition cost plus 50%;
> (ii)     Usual and customary price charged by durable medical equipment providers to the general public; or
> (iii)    Purchase fee for such durable medical equipment established in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule.

120.   In essence, these new calculations establish a daily rental rate for Non-Fee Schedule items at 1/300th of the acquisition cost, and establish a maximum total rental reimbursement per patient that is not to exceed the lesser of 150% of the acquisition cost of the item, the usual and customary price charged by other DME providers to the general public, or the purchase fee established in the Fee Schedule.

121.   Accordingly, when a healthcare provider submits a bill to collect charges from an insurer for DME using either a NF-3 or HCFA-1500 form, the provider represents – among other things – that:

> (i)      the provider received a legitimate prescription for reasonable and medically necessary DME from a healthcare practitioner that is licensed to issue such prescriptions;

> (ii)     the prescription for DME is not based on any unlawful financial arrangement;

> (iii)    the DME identified in the bill was actually provided to the patient based upon a legitimate prescription identifying medically necessary item(s);

    (iv)    The fee sought for DME provided to an Insured was not in excess of the price contained in the applicable DME Fee Schedule (Medicaid Fee Schedule or WC DME Fee Schedule) or the standard used for a Non-Fee Schedule item; or

    (v)    The *pro rata* monthly rental fee sought for renting DME or OD to an Insured was not in excess of the standard for calculating rental reimbursement.

122.    In addition to the Defendants' submission of bills based upon unlawful financial arrangements, forged prescriptions, and medically unnecessary prescriptions pursuant to predetermined fraudulent protocols, the Defendants submitted bills to Liberty Mutual that misrepresented, to the extent that any Fraudulent Equipment was provided, that the charges for Fraudulent Equipment were for permissible reimbursement rates, when they were not.

123.    When the Defendants submitted bills to Liberty Mutual seeking payment for the Fraudulent Equipment, each of the charges identified HCPCS codes that were used to describe the items purportedly rented or provided to the Insureds.

124.    When the Defendants submitted bills to Liberty Mutual seeking payment for renting Non-Fee Schedule items billed under HCPCS Code E1399, which included primarily SAM Units, the Defendants fraudulently misrepresented that the charges were no greater than the maximum permissible reimbursement amount of 10% of the Defendants' legitimate acquisition cost for a monthly rental.

125.    For example, and as set forth in Exhibit "1", when the Defendants submitted bills to Liberty Mutual using HCPCS Code E1399 for purportedly renting SAM Units to Insureds – to the extent the units were actually provided to Insureds at all – the Defendants fraudulently misrepresented that they were able to collect $70.00 per day, or $2,100.00 per month, as 10% of their acquisition cost, for each SAM Unit rented to an Insured.

126.    The Defendants' charges for the rental of SAM Units under HCPCS Code E1399 at $2,100 per month, which was represented to be 10% of their cost to acquire each SAM Unit, by extension makes the Defendants' acquisition cost $21,000.00 for each SAM Unit.

127.    In actuality, the acquisition cost for each SAM Unit was only a fraction of the acquisition cost used as a basis by the Defendants for their rental charges and, similarly, the maximum reimbursement rate was only a fraction of what was charged by the Defendants to Liberty Mutual. In fact, First Supply's own billing submissions indicate they only paid $3,400.00 per SAM Unit. Based on that acquisition price, the maximum monthly price First Supply could charge to rent a SAM Unit would be $340.00 or 10% of that acquisition price, which would average approximately $11.33 per day.

128.    In all of the charges submitted to Liberty Mutual for the rental of SAM Units under HCPCS Code E1399, the Defendants fraudulently misrepresented that the maximum reimbursement rate was $70.00 per day, more than *six times* what their maximum reimbursement should have been. Throughout the course of their fraudulent scheme, the Defendants charged Liberty Mutual more than six times the maximum reimbursement rate for each day any given Insured supposedly had the SAM Unit rental.

III.    **The Fraudulent Billing Defendants Submitted or Caused to be Submitted to Liberty Mutual**

129.    To support their fraudulent charges, Defendants systematically submitted or caused to be submitted hundreds of NF-3, HCFA-1500 forms, and/or treatment reports through the Defendants to Liberty Mutual seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

130.     The Defendants' billing forms (*i.e.*, NF-3 and/or HCFA-1500 forms) and treatment reports submitted to Liberty Mutual by and on behalf of First Supply were false and misleading in the following material respects:

(i)     The billing forms and supporting documentation submitted by and on behalf of First Supply uniformly misrepresented to Liberty Mutual that the Fraudulent Equipment was medically necessary. In fact, the Fraudulent Equipment provided, to the extent provided at all, was not medically necessary and was prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care;

(ii)    The billing forms and supporting documentation submitted by and on behalf of First Supply uniformly misrepresented to Liberty Mutual that the Defendants operated lawfully in compliance with licensing laws.  In fact, in many instances, the Defendants billed Liberty Mutual for Fraudulent Equipment as a result of forged, unauthorized, or illegally duplicated prescriptions;

(iii)   The billing forms and supporting documentation submitted by and on behalf of First Supply uniformly misrepresented to Liberty Mutual that the Defendants operated lawfully in compliance with licensing laws.  In fact, First Supply dispensed the Fraudulent Equipment purportedly provided to Insureds as a result of unlawful kickback and financial arrangements; and

(iv)    The billing forms and supporting documentation submitted by and on behalf of First Supply uniformly misrepresented to Liberty Mutual that the Defendants billed properly and dispensed SAM Units on a rental basis.  In fact, the bills for the Fraudulent Equipment submitted to Liberty Mutual by the Defendants fraudulently inflated the rental charges as the maximum daily rental rate for the SAM Units is substantially less than the $70.00 per day charged to Liberty Mutual.

## IV.     **Defendants' Fraudulent Concealment and Liberty Mutual's Justifiable Reliance**

131.     Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing they submitted, or caused to be submitted, to Liberty Mutual.

132.     To induce Liberty Mutual to promptly pay the fraudulent charges for the Fraudulent Equipment, Defendants systematically concealed their fraud and went to great lengths to accomplish this concealment.

133. Specifically, the Defendants knowingly misrepresented and concealed facts related to First Supply in an effort to prevent discovery of the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

134. Additionally, the Defendants entered into complex financial arrangements that were designed to, and did, conceal the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

135. Additionally, the Defendants knowingly misrepresented and concealed facts in order to prevent Liberty Mutual from discovering that the Fraudulent Equipment was medically unnecessary and provided – to the extent it was provided at all – pursuant to fraudulent pre-determined protocols designed to maximize the charges that could be submitted, rather than to benefit the Insureds who were supposedly provided with the Fraudulent Equipment.

136. The Defendants also hired law firms to pursue collection of the fraudulent charges from Liberty Mutual and other automobile insurers. These law firms routinely file expensive and time-consuming litigation against Liberty Mutual and other automobile insurers if the charges are not promptly paid in full.

137. The Defendants' collection efforts through numerous separate no-fault collection proceedings, which proceedings may continue for years, are an essential part of their fraudulent scheme since they know it is impractical for an arbitrator or civil court judge in a single no-fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address the Defendants' large-scale, complex fraud scheme involving numerous patients across numerous different clinics located throughout the metropolitan area.

138. Liberty Mutual is under statutory and contractual obligations to process claims promptly and fairly within 30 days. Liberty Mutual takes steps to timely respond to all claims and

to ensure that No-fault claim denial forms or requests for additional verification of No-fault claims are properly addressed and mailed in a timely manner.

139.    The facially-valid documents submitted to Liberty Mutual in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause Liberty Mutual to rely upon them. As a result, Liberty Mutual incurred damages of more than $490,000.00 based upon the fraudulent charges for the Fraudulent Equipment.

140.    Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from Liberty Mutual, Liberty Mutual did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

**AS AND FOR A FIRST CAUSE OF ACTION**
**Against First Supply**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

141.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

142.    There is an actual case in controversy between Liberty Mutual and the Defendants regarding more than $316,000.00 in pending no-fault insurance billing for the Fraudulent Equipment that has been submitted to Liberty Mutual under the name of First Supply.

143.    First Supply has no right to receive payment for any pending bills submitted to Liberty Mutual, because the Fraudulent Equipment, to the extent provided at all, was not medically necessary and was prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care.

144.    First Supply has no right to receive payment for any pending bills submitted to Liberty Mutual because First Supply dispensed the Fraudulent Equipment purportedly provided to Insureds through the use of unlawful kickback and financial arrangements.

145.    First Supply has no right to receive payment for any pending bills submitted to Liberty Mutual because, in many instances, the Defendants billed Liberty Mutual for Fraudulent Equipment dispended as a result of forged, unauthorized, or illegally duplicated prescriptions.

146.    First Supply has no right to receive payment for any pending bills submitted to Liberty Mutual because the bills for Fraudulent Equipment submitted to Liberty Mutual by the Defendants fraudulently inflated the charges to Liberty Mutual.

147.    Accordingly, Liberty Mutual requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that First Supply has no right to receive payment for any pending bills submitted to Liberty Mutual.

## AS AND FOR A SECOND CAUSE OF ACTION
### Against All Defendants
### (Common Law Fraud)

148.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

149.    First Supply and Binyaminov intentionally and knowingly made false and fraudulent statements of material fact to Liberty Mutual and concealed material facts from Liberty Mutual in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Equipment.

150.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the billed-for services were medically necessary when, in fact, the Fraudulent Equipment, to the extent provided at all, was not

medically necessary and was prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) in every claim, the representation that First Supply was acting lawfully and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when, in fact they dispensed the Fraudulent Equipment purportedly provided to Insureds as a result of unlawful kickback and financial arrangements; (iii) in every claim, the representation that First Supply was acting lawfully and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when, in fact, in many instances, they billed Liberty Mutual for Fraudulent Equipment as a result of forged, unauthorized, or illegally duplicated prescriptions; and (iv) in every claim, the representation that the billed-for services were properly billed in accordance with the Fee Schedule, when, in fact, the bills for Fraudulent Equipment submitted to Liberty Mutual by the Defendants fraudulently inflated the charges to Liberty Mutual.

151.    First Supply and Binyaminov intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through First Supply that were not compensable under the No-Fault Laws.

152.    Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $490,000.00 pursuant to the fraudulent bills submitted by the Defendants. The chart annexed hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that have been identified to-date that First Supply submitted, or caused to be submitted, to Liberty Mutual.

153.     First Supply and Binyaminov's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

154.     Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**AS AND FOR A THIRD CAUSE OF ACTION**
**Against All Defendants**
**(Unjust Enrichment)**

155.     Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

156.     As set forth above, First Supply and Binyaminov have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

157.     When Liberty Mutual paid the bills and charges submitted by or on behalf of First Supply for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

158.     The Defendants have been enriched at Liberty Mutual's expense by Liberty Mutual's payments, which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

159.     The Defendants' retention of Liberty Mutual's payments violates fundamental principles of justice, equity, and good conscience.

160.     By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $490,000.00.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**Against Binyaminov**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

161.   Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

162.   First Supply is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

163.   Binyaminov knowingly conducted and/or participated, directly or indirectly, in the conduct of First Supply's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges that First Supply was not eligible to receive under the New York No-Fault Laws because: (i) the Fraudulent Equipment, to the extent provided at all, was not medically necessary and was prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Fraudulent Equipment purportedly provided to Insureds was dispensed through the use of unlawful kickback and financial arrangements; (iii) in many instances, the Defendants billed Liberty Mutual for Fraudulent Equipment as a result of forged, unauthorized, or illegally duplicated prescriptions; and (iv) the bills for Fraudulent Equipment submitted to Liberty Mutual by the Defendants fraudulently inflated the charges to Liberty Mutual.  A representative sample of the fraudulent billings and corresponding mailings submitted to Liberty Mutual that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

164.   First Supply's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to automobile insurers.  The predicate acts of mail fraud

41

are the regular way in which Binyaminov operated, and continues to operate First Supply, insofar as First Supply is not engaged as a legitimate supplier of DME, and therefore, acts of mail fraud are essential in order for First Supply to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that First Supply continues to attempt collection on the fraudulent billing submitted by First Supply to the present day.

165.    First Supply is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to Liberty Mutual and other automobile insurers. These inherently unlawful acts are taken by First Supply in pursuit of inherently unlawful goals – namely, the theft of money from Liberty Mutual and other automobile insurers through fraudulent no-fault billing.

166.    Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $490,000.00 pursuant to the fraudulent bills submitted through First Supply.

167.    By reason of its injury, Liberty Mutual is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## FIFTH CAUSE OF ACTION
### Against Binyaminov and John Doe Defendants
### (Violation of RICO, 18 U.S.C. § 1962(d))

168.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

169.    First Supply is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

170.    Binyaminov and the John Doe Defendants are owners of, employed by, or associated with the First Supply enterprise.

171.    Binyaminov and the John Doe Defendants knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of First Supply's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges since its inception seeking payments that First Supply was not eligible to receive under the New York No-Fault Laws because: (i) the Fraudulent Equipment, to the extent provided at all, was not medically necessary and was prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Fraudulent Equipment purportedly provided to Insureds was dispensed through the use of unlawful kickback and financial arrangements; (iii) in many instances, the Defendants billed Liberty Mutual for Fraudulent Equipment as a result of forged, unauthorized, or illegally duplicated prescriptions; and (iv) the bills for Fraudulent Equipment submitted to Liberty Mutual by the Defendants fraudulently inflated the charges to Liberty Mutual. A representative sample of the fraudulent bills and corresponding mailings submitted to Liberty Mutual that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

172.    Binyaminov and the John Doe Defendants knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud Liberty Mutual and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to Liberty Mutual.

173.     Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $490,000.00 pursuant to the fraudulent bills submitted through First Supply.

174.     By reason of its injury, Liberty Mutual is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**WHEREFORE**, Plaintiffs, Liberty Mutual, demand that a Judgment be entered in their favor:

A.     On the First Cause of Action against the Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that First Supply, has no right to receive payment for any pending bills for the Fraudulent Equipment submitted to Liberty Mutual;

B.     On the Second Cause of Action against the Defendants, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $490,000.00 together with punitive damages, costs, interest, and such other and further relief as the Court deems just and proper;

C.     On the Third Cause of Action against the Defendants, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $490,000.00 together punitive damages, costs, interest, and such other and further relief as the Court deems just and proper.

D.     On the Fourth Cause of Action against Binyaminov, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $490,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest, and further relief as the Court deems just and proper.

E.      On the Fifth Cause of Action against Binyaminov and the John Doe Defendants, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $490,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest, and further relief as the Court deems just and proper.

Dated: November 10, 2023
        Uniondale, New York

                                        RIVKIN RADLER LLP


                                        By:    /s/ *Barry I. Levy*
                                               Barry I. Levy, Esq.
                                               Michael A. Sirignano, Esq.
                                               Frank P. Tiscione, Esq.
                                               Alexandra Wolff, Esq.
                                        926 RXR Plaza
                                        Uniondale, New York 11556
                                        (516) 357-3000

                                        *Counsel for Plaintiffs Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, The First Liberty Insurance Corporation, LM Insurance Corporation, Liberty Mutual Mid-Atlantic Insurance Company, Liberty County Mutual Insurance Company, LM Property and Casualty Insurance Company, Safeco Company of Indiana, and American States Insurance Company*

45